# SHERWOOD v. DREWSON.

---

PATENTS; INTERFERENCE; INVENTION; REDUCTION TO PRACTICE.

1. To reduce to practice, something of practical use must be produced, coupled with a knowledge, preferably by actual trial, that the thing will work practically for the intended purpose.

2. Complete invention amounts to demonstration. When it has not quite passed beyond experiment, has not quite attained certainty, and has fallen short of demonstrating the capacity of the invention to produce the desired result, the invention itself is still inchoate. (Following

*Hunter* v. *Stikeman,* 13 App. D. C. 219, and *McKenzie* v. *Cummings,* 24 App. D. C. 140.)

3. Satisfactory evidence of reduction to practice in an interference must embrace all the elements of the issue, and must leave nothing to inference, since no one of these elements can be determined to be subordinate and immaterial.   (Following *Blackford* v. *Wilder,* 21 App. D. C. 10, and *Robinson* v. *Seelinger,* 25 App. D. C. 240.)

4. In an interference involving the invention of a process for preparing materials for paper-making from pithy stalks, in which one party filed his application about one year before the other, and it appeared that both parties had been experimenting alone and together for several years, it was *held* that the evidence was insufficient to show that either party had conceived the invention of the issue until he filed his application, or actually reduced to practice, and that, as the filing of the senior party's application was a constructive reduction to practice, he was entitled to an award of priority.

No. 374.   Submitted January 9, 1907.   Decided March 5, 1907.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.          *Affirmed.*

The facts are stated in the opinion.

*Mr. C. C. Linthicum, Mr. A. H. Graves,* and *Mr. L. S. Bacon* for the appellant.

*Mr. J. E. H. Hyde* for the appellee.

Mr. Justice McCOMAS delivered the opinion of the Court:

In this appeal the issue of this interference is:

"1. The process of preparing materials for paper-making from cornstalks, sugar cane, and analogous pithy stalks, which consists in: (1) Cooking said stalks continuously in a single cooking liquor which contains the ordinary chemical reagents used to produce cellulose from vegetable fibres for a sufficient length of time to separate the fibres of the shell and the pith cells from their incrustaceous matter; (2). separating the fibrous matter from the pith cells by washing and screening; (3) collecting

the fibrous materials and the pith cells, substantially as described.

"2. The process of preparing materials for paper-making from cornstalks, sugar cane, and analogous pithy stalks, which consists in: (1) Cooking said stalks continuously in a single cooking liquor containing a caustic alkali for a sufficient length of time to separate the fibres of the shell and the pith cells from their incrustaceous matter; (2) separating the fibrous matter from the pith cells by washing and screening; (3) collecting fibrous material and the pith cells, substantially as described.

"3. The process of preparing materials for paper-making from cornstalks, sugar cane, and analogous pithy stalks, which consists in: (1) Cutting or otherwise dividing the stalks into pieces; (2) cooking said stalks continuously in a single cooking liquor which contains the ordinary chemical reagents used to produce cellulose from vegetable fibres for a sufficient length of time to separate the fibres of the shell and the pith cells from their incrustaceous matter; (3) separating the fibrous matter from the pith cells by washing and screening; (4) collecting the fibrous material and the pith cells, substantially as described.

"4. The process of preparing materials for paper-making from cornstalks, sugar cane, and analogous pith stalks, which consists in: (1) Cutting or otherwise dividing the stalks into pieces; (2) cooking said stalks continuously in a single cooking liquor containing a caustic alkali for a sufficient length of time to separate the fibres of the shell and the pith cells from their incrustaceous matter; (3) separating the fibrous matter from the pith cells by washing and screening; (4) collecting the fibrous material and the pith cells, substantially as described."

The invention here involved is the disclosure that in a single cooking an entire cornstalk, sugar cane, or other like pithy stem may be cooked, if the liquor be strong enough and the time be long enough, sufficiently to separate the fibres of the shell of the stalk and the pith cells contained inside, also, from the other matter, without destroying the pith cells, so that, by washing and screening, the pith cells may be separated from the

fibrous material, and the two kinds of cells may be separately collected. The claims, which are the counts of this issue, were first made by Viggo Drewson [the appellee], and upon the suggestion of the Primary Examiner were adopted by George R. Sherwood [the appellant]. The following extract from Drewson's application explains these counts:

"The difficulty in preparing fibrous material (cellulose) or other products suitable for the manufacture of paper from these pithy stalks lies in the different character of the different parts of the stalk. A cornstalk proper, namely without leaves or husks, for instance, consists of two parts which can be used by paper manufacturers, to wit, the outside shell and the pith. The shell has a character similar to wood and contains a high percentage of fibres, while the pith is spongy and consists principally of oblong cells. This is also true of the sugar cane.

"The shell when treated with chemical substances, such as caustic soda, or sulphurous acid and lime, yields a large proportion of fibres which are adapted for paper-making and produce an opaque sheet of paper. The pith, on the other hand, when treated with the same substances, disintegrates into cells, and the sheet of paper derived therefrom is transparent and resembles imitation parchment paper.

"It has heretofore been supposed that this difference in character in the fibres of the shell and the cells of the pith required two separate cooking operations, and that the former required a stronger solution and a longer time in cooking than the latter. It was also before thought that if the pith were cooked simultaneously with the shell in the same strength of the liquor and for the same length of time as are required for the disintegration of the fibres of the shell and their separation from the incrustaceous matter, that the cells of the pith are practically destroyed and could not be utilized.

"I have discovered, however, that this is not always the case, and that, by the use of proper means, only a single operation of cooking is necessary for the entire stalk shell and pith, and that both can be used, either separately or together, in making the desired paper by using the following method:

"The stalk is first cut up into pieces so as to expose the pith. These pieces are placed in a digester or rotary containing a solution of about 15 per cent of caustic soda; the stalks are then cooked for six hours under a steam pressure of 60 pounds per square inch. The contents of the digester are run out into a vat, and washed. The solids in the washed material, namely, the cooked fibres and pith cells, are thrown on a screen to separate such portions as are uncooked, and are then run into a beating engine provided with washers. The washers of this engine are covered either with perforated metal sheets or with wire meshes, having openings large enough to permit the pith cells to pass through, yet small enough to retain the fibrous material. The separation of the cellulose fibres from the pith cells is effected in the beater by continuous washing of the solid materials contained therein. The fibrous material is then ready to be placed upon the wet machine in a manner familiar to those acquainted with the prior art.

"The water containing the pith cells flowing from the washer is sometimes sufficiently thickened by the mass of pith cells contained in it to run directly on to the wet machine, and if it be not so thickened the water containing the pith cells is run off from the washer into settling tanks, where the pith cells are allowed to settle. When they have settled in such tanks sufficiently to give the needed consistency, familiar to those skilled in the art, the clean water is run off from the tank, and the pith cells are carried to a wet machine to collect them for subsequent use, either alone or together with the fibrous portion, in a manner understood by persons skilled in this art. This process requires but a single cooking, which is effective to separate the fibres of the shell and the pith cells, in the manner and with the result just stated; and after this process the pith and shell fibre and the pith cells, it is claimed, are in a condition ready for use in making paper without further treatment."

Sherwood in his specification states that:

"This invention relates to an improved process of making fibre stock from cornstalks and analogous plants, and it has for its salient objects to provide a process whereby two kinds of

characteristically different fibre may be practically and effectively separated; to provide a process which may be carried on continuously by the use of comparatively simple and inexpensive apparatus, and without chemically or physically changing the character of the fibre; to provide a process which is characterized by the absence of mechanical injury to the fibre cells; and, in general, to provide a simple and improved process of the character referred to.

"I have discovered that these two kinds of fibre may be practically and effectually separated by first cooking the stalks in a reducing solution until the physical structure of the plant is broken down and the connective tissues disintegrated to such extent as to free the two fibres, and then subjecting the pulp thus produced to a screening operation in which the flowing action of a liquid is largely utilized for effecting the sorting out and separation of the two kinds of fibre."

Sherwood's lengthy specification does not particularly describe the reducing solution to which he refers, nor the time required for the cooking, nor does he definitely describe the cooking process. His entire application treats of the process of mechanical separation of the two fibres after cooking, and all of his original claims were concerned with the process of separation of the two classes of cells in the particular manner described in his specification. Some of his claims assume the prior cooking of the stalks; others speak of the art of making fibre from cornstalks, which consists in cooking the stalks in a reducing solution until reduced to a mass of pulp in which the connective tissue is broken down and the ultimate fibre freed.

In Sherwood's application and claims, the cooking is secondary, while the process of mechanical separation of the two varieties of cells from each other is primarily and particularly described. Drewson in his application, from which we have quoted, primarily insists that he has discovered that only a single operation of cooking is necessary, instead of two, as before supposed, for the disintegration of the fibres of the shell and the pith cells, and that both varieties of cells can be preserved and utilized, either separately or together, in making paper.

Both parties made preliminary statements and filed proofs. Drewson, the senior party, claims to have conceived the invention, to have disclosed it to others, and to have reduced it to practice during April, May, and June, 1903, and his application was filed July 9, 1903. Sherwood claims conception, disclosure, and reduction to practice in September, 1902. He filed his application June 11, 1904. The Examiner of Interferences determined that Sherwood conceived the invention in September, 1902; that one Bonfield had obtained certain knowledge of it from Sherwood and had imparted his knowledge to Drewson in June, 1903; that Drewson failed to prove conception of the invention prior to that time; and that Sherwood should prevail because he was the first and only inventor of the process in issue.

The Examiners-in-Chief and the Commissioner successively decided that neither party to this interference had reduced this invention to practice prior to the filing of their applications in issue, and therefore Bonfield had made no disclosure of the invention to Drewson, the senior applicant, and that really Sherwood failed to prove a conception of the invention at any time before the date of his application.

The Commissioner, and in effect the Examiners-in-Chief, concur in the usual conclusion that neither party proved conception or reduction to practice prior to the day that Drewson filed his application, and that Sherwood, the junior party, is in like situation and only entitled to his filing date as the time of his conception and reduction to practice.

To make paper from cornstalks and like stalks was not novel, but the paper produced was not so desirable commercially.

Everybody knew that a cornstalk was composed of a hard shell outside and a soft pith inside. It was learned that the shell by chemical cooking under pressure could be reduced to long cells, suited to make soft and flexible paper, and that the pith could in like manner be reduced to short granular cells, which would yield a hard, brittle paper. All the parties interested in this interference, the principals and witnesses, knew these things.

Sherwood alleges that he conceived the invention in the middle of September, 1902, and in the same month reduced it to practice. During the four preceding years Sherwood had been trying to utilize cornstalks, and had invented a machine for mechanically separating the shell of the cornstalk from the pith. Mariner and Hoskin, chemists whom he had consulted, had advised him that paper stock could not be economically produced from a cornstalk without first separating the pith, and that paper stock can be produced from the shell, and that, under proper treatment, the pith itself produces a substance of value in the preparation of paper.

It was then believed by these parties that the stalks could not be reduced in a single cooking operation without destroying the pith cells by the action of the strong chemicals and by the long cooking required to reduce the hard shell of the stalk.

Near the end of the last-mentioned year, Sherwood, by means of a company he had formed, established an experimental plant in Chicago, in which was installed his depithing machine, and the experiments looking to the use of cornstalks in the manufacture of paper stock and of paper proceeded. These experiments were made with the depithed shell, and the pith also, to discover the possibilities, in the fibre and in the pith, of producing paper stock. In addition to the depithing machine, a rotary digester, a beating machine, a screen, a stuff chest, and a wet machine in conjunction with a boiler and a gas engine were installed. In making experiments on the shell fibre to which pith adhered, Sherwood observed that the pith shells washed out with the wash water, and he proceeded so far as to allow the pith cells to settle, and from some of these, collected by means of a hand screen, he made a rough sheet of paper. Sherwood regretted the waste of these pith cells and endeavored to make use of them in the fall of 1902.

That Sherwood had observed the pith cells were carried off with the waste water, and that he collected these escaping pith cells occasionally and made them into sheets of paper on a hand screen, is corroborated by Bonfield, Brand, and Miller, all fair and intelligent witnesses. This treatment of the subject-mat-

ter by Sherwood would appear to be almost the conception of the invention by him, but other considerations determine us to concur with the two higher tribunals of the Patent Office that neither Sherwood nor anyone else at the Chicago experiment plant at any time clearly appreciated the process the disclosure of which, in the application of Drewson, constitutes the invention of this issue.

On December 1, 1902, Sherwood filed an application which resulted in a patent. It is true that this application was a division of an application filed in October, 1901, but it was executed by Sherwood several months after he alleges he had conceived the invention, and it related to the same subject-matter, and he urged the importance of separating the pith from the fibrous portion of the stalk, as far as practicable, before subjecting either to chemical treatment or disintegration, and proceeded to show that the pith and fibrous parts of the stalk so separated may be treated separately in digesters or boilers, and, after such digestion, reunited if desired, producing a product of value not to be obtained by dissolving both together in the first instance. This patent further stated that if less heat be used, more time or a stronger solution would be required, and, among other things, that the treatment of the pith must be gentler than that required for the proper digestion of the shell fibre. No stress is laid upon the collecting of pith cells after the cooking of the stalk shell. Emphasis is given only to the separation of the shell and pith by machine, and the separate cooking of the pith.

Bonfield, working under Sherwood's direction, at the end of December, 1902, says that when the pith was treated the shell fibre was screened away and recooked. It is significant that neither Sherwood nor his witnesses testify that they washed out the pith cells from the shell fibre after a single cooking; yet Sherwood now claims that he then knew that more than one cooking was unnecessary to satisfactorily separate the pith cells from the fibre cells of the corn shell, and early in 1903 Sherwood's letters show that his main reliance was upon the use of the depithing machine; that he sought a mechanical depith-

ing of the stalks by the machine, instead of a chemical separation by cooking with chemical agents.

Sherwood had learned that the pith cells must be removed, for they caused the paper produced to be hard and stiff and unsuited for commercial use, and that if the pith cells were eliminated the fibrous material of the stalk would produce a paper white and soft. When it was found Sherwood's depithing machine did not remove all of the pith, and that the remaining pith, when cooked with the stalk, produced samples, even after the pulp was washed to remove the pith cells, still unsatisfactory, experiments were continued. Wallace, an expert in paper-mill work as an engineer, was called in, and, being shown samples of paper made in October, 1902, dissuaded Sherwood and his companions from building mills until more satisfactory results had been obtained, and at his instance the company employed Drewson, whom Wallace recommended as his friend and as an expert in the chemistry of pulp and paper making. About November, 1902, Drewson first met Sherwood in Chicago, and thereafter Drewson and Wallace co-operated with Sherwood in trying to raise capital to use the invention so far as it had advanced. These efforts did not succeed.

If Sherwood at this time had fully appreciated that the pith and shell of the cornstalk could have been separated by a single cooking operation, and that the two varieties of cells could be separately collected and used, either alone or together, to produce paper stock, it is exceedingly strange that with the experiment plant and all needed apparatus at hand, and while he was daily investigating in order to produce paper commercially, that he should have been content with now and then producing a single piece of paper upon a hand mold, and that while he was collecting small quantities of pith cells, proceeding from the operation of the mechanical depithing, and the two separate cooking operations, upon which he relied in Chicago, he still continued to rely upon the same process until after the filing of Drewson's application.

Late in April, 1903, Drewson, Sherwood, and Bonfield went to the Warren Mills, in Maine, and industriously experimented

until the end of May in that year, when Sherwood and Drewson went together to New York to interest capitalists in the scheme, leaving Bonfield to carry on further experiments at the Warren Mills, and to use up a quantity of raw material that remained on hand. The experiments at the Warren Mills were carried on under Drewson's directions, all three of these visitors directing their efforts to perfect the paper-making from the corn-stalk. Before Drewson went to Warren Mills, and in April, 1903, Drewson had filed an application in which he had described a process requiring two cookings of a stalk.

This patent was afterwards granted. In it Drewson states that the shell, when treated with caustic soda and sulphurous acid and lime, yields a large proportion of fibres which are adapted for paper-making, producing an opaque sheet of paper. The pith, on the other hand, when treated with the same substances, disintegrates into cells, and the sheet of paper produced is transparent, resembling parchment paper. He says the shell requires a stronger cooking liquor and a longer time than is required in cooking the pith. He proposes separating the shell from the pith mechanically, and cooking them apart in caustic-soda solutions of different strength and thereafter uniting them in the proportions desired. The patent states that the split pieces of cornstalk were digested in a solution so weak that only the pith became disintegrated and the shell only partially so. The partly cooked shells were then to be separated from the pith cells, and carried to a second digester, to be cooked in a stronger solution so as to yield the fibrous material in the shell. This method was tried at Warren Mills, and the success was a qualified one.

Bonfield submitted a report of all the experiments at Warren Mills. Few of the experiments recorded throw light upon the controversy here. After Sherwood and Drewson went away together, Bonfield, in June, 1903, wrote two letters to Drewson, which the appellant insists disclosed this invention to Drewson, which invention Bonfield sincerely believes Sherwood had imparted to him. In neither one of these letters, nor in the record of all the tests, do we find any definite information concerning

the collection of the pith cells. The paper produced by eliminating pith cells steadily improved, and in one of the later reports it is said that after washing twenty hours they washed away as much pith as possible, and it was remarked that "the pith settled quickly making it possible and practicable to save it." In none of these experiments is it recorded that the pith was actually saved, or that it was proved that it was in condition for making paper; yet the issue we are considering requires that the pith cell shall be collected and shall be in condition for making paper; therefore it is clear that none of these experiments can be held to constitute a reduction to practice of the process. We have said that Sherwood almost, but not quite, attained the conception of this invention. It is significant that while they were together seeking the same result, and were most friendly, Sherwood did not disclose the invention to Drewson. Before they departed from Warren Mills, Drewson appears, as an experienced chemist, to have lost faith in the mechanical separation of the two kinds of cells and to have gained increasing confidence in his power to separate them by chemical cooking; but we are convinced that Drewson at that time also failed to conceive and reduce to practice this invention; that he narrowly missed it, but still failed to achieve a "reduction to successful practice." All of the experiments in Chicago and in Maine are fully and fairly stated by intelligent and honest witnesses, and after carefully examining the long record we concur with the Commissioner of Patents that there is a want of satisfactory evidence that anyone at any time conceived the invention, and there is no evidence that either of the applicants had reduced it to practice when, at the end of May, Sherwood and Drewson left the Cumberland mill.

Counsel for appellant say that it was impossible that both parties in some way could be led to file applications for an invention which neither of them had conceived. We need not curiously inquire how Drewson finally came upon the invention first disclosed by his application. We agree with the Commissioner that, whilst the witnesses thought Sherwood disclosed the invention to them, he fell short of disclosure of that which he

had nearly found. Not only what he said, but all that he did, fell short of this invention; apparently it eluded him while he still pursued mechanical devices for depithing and separating the two kinds of cells.

It happened that Bonfield remained to use up the material on hand. Both applicants contend that Bonfield reduced the invention to practice in June, 1903. Had he done so, it might be very difficult to say to whose advantage Bonfield's achievement accrued, but as we concur with the two highest tribunals of the Patent Office in saying that Bonfield's successors fell short of a reduction to successful practice, we quite end the discussion on this point. We cannot agree with the parties, although upon this point they agree with each other. We must concur with the two tribunals just mentioned.

Reduction to practice must produce something of practical use, coupled with a knowledge, preferably by actual trial, that the thing will work practically for the intended purpose. The conception may give rational hopes of future fulfilment of the purpose at which it aims, but if, as a matter of practice, it falls short of success, it is not a sufficient reduction to practice. Complete invention amounts to demonstration. When, as in this case, it had not quite passed beyond experiment, and had not quite attained certainty, and had fallen short of demonstrating the capacity of the invention to produce the desired result, the invention itself was still inchoate. These parties sought certainty, but they had not attained certainty beyond all conjecture, which certainty the law requires. See *McKenzie* v. *Cummings,* 24 App. D. C. 140; *Hunter* v. *Stikeman,* 13 App. D. C. 219; *Coffin* v. *Ogden,* 18 Wall. 124, 21 L. ed. 823

In Maine a great advance was made beyond the Chicago experiment, for in the former place the escape of the pith cells was more fully observed, and the significant fact that they were not destroyed by the cooking; and the idea that it was feasible to collect them for subsequent use was in the minds of all the persons engaged in those experiments. But the result of all the experiments was that, by one cooking, the pith cells and shell fibres could be so separated that pith cells could be entire-

ly washed away if it was desired to make soft sheets of paper. This court has often said that satisfactory evidence of reduction to practice must embrace all the elements of the issue, and must leave nothing to inference, since no one of these elements can be determined to be subordinate and immaterial. ' *Blackford* v. *Wilder,* 21 App. D. C. 10; *Robinson* v. *Seelinger,* 25 App. D. C. 240.

This process of preparing the materials for paper-making from cornstalks and the like required the collecting of the fibrous materials and the pith cells substantially as described. When it was that Drewson attained a complete conception of the invention the record fails to show. The tribunals of the Patent Office all agree that the four claims in Drewson's application, which Sherwood adopted, constitute invention, and the filing of his application, by a familiar rule, constitutes a constructive reduction to practice of the invention and of every element of it; and since Drewson is the senior party we concur with the Commissioner that Drewson is the prior inventor.

The decision of the Commissioner of Patents in this case must therefore be affirmed, and the clerk of this court will certify this decision and opinion to the Commissioner of Patents in accordance with law.           *Affirmed.*

Mr. Justice.Robb dissenting.