URQUHART v. PASCHKE.

SAME v. BURMEISTER.

Patent Appeal Nos. 3217, 3218.

Court of Customs and Patent Appeals.
March 19, 1934.

Joseph G. Denny, Jr., of Philadelphia, Pa., for appellant.

Maxwell Barus, of New York City (E. C. Sanborn, of New York City, of counsel), for appellees.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

Two appeals from decisions of the Board of Appeals of the United States Patent Office in the respective cases named in the caption

are here before us. Each appeal involves a single count. The applications of the respective appellees are stated to be the property of a common owner. There is only one application by appellant. A combined record was made up in the patent office and upon the appeal to this court and, the subject-matter of the counts being similar and certain of the questions involved being common to both cases, they were briefed and orally argued together. We shall dispose of both in one opinion, dividing same into two parts.

The counts of both interferences originated in an application filed by Urquhart on November 17, 1925, being serial No. 69,559. The application of Burmeister was filed April 26, 1926, being serial No. 104,750, and that of Paschke May 27, 1926, being serial No. 112,-098.

It seems that both counts were originally suggested to Paschke by an Examiner on July 12, 1926, in the first patent office action on his application; that he inserted both in his application, and both were originally included in interference No. 54,287.

The application of Burmeister was tentatively rejected July 27, 1926, without the counts having been suggested to him. On July 27, 1927, Urquhart filed a motion to dissolve interference No. 54,287, and thereupon the attorneys for Paschke and Burmeister, or their common assignee, caused count 1 of that interference to be inserted in the Burmeister application, to which, following the tentative rejection, various amendments had been offered pending final action thereon. Thereupon, in due course, interference No. 55,734, which is involved in appeal No. 3218, was declared, and interference No. 54,287, involved in appeal No. 3217, was amended so as to leave therein only count 2 thereof.

Appeal No. 3217, Interference No. 54,287:

This is the interference with Paschke and will be first considered. The count involved reads as follows:

"The method of forming a fire smothering foam which comprises flowing a stream of liquid under pressure through an ejector and creating suction thereby, drawing separately into said stream at substantially the same locus by the suction created by said stream, a plurality of powders of different chemical content soluble therein and forming when combined therewith a stable foam, said substances being maintained inert until contact is had with said solvent."

Motion was made by Urquhart to dissolve and same having been denied by the Law Ex-

aminer, the Examiner of Interferences, following the taking of testimony, rendered his decision awarding priority to Urquhart. In so holding, the Examiner of Interferences accorded to Paschke the date of May 28, 1925, for conception and reduction to practice, that being the date on which Paschke had filed an application in Germany, the benefit of which he claimed. To Urquhart there was accorded a date of conception and reduction to practice "as of the fall of 1924."

Upon appeal, the Board of Appeals reversed the decision of the Examiner of Interferences and awarded priority to Paschke, holding that while Urquhart might be awarded the fall of 1924 for conception, what he then did was not "anything more than an abandoned experiment," and saying:

" * * * We fail to find diligence [by Urquhart] established from the time just prior to May 28, 1925, the filing date of Paschke's German application, up to the filing date of Urquhart November 17, 1925."

Urquhart's reasons for appeal, or assignment of errors, raise three questions, viz., (1) The right of Paschke to make the count; (2) the effect to be given the work of Urquhart in 1924, and (3) the question of Urquhart's diligence, if diligence on his part be involved.

We first consider the question of Paschke's right to make the count. The argument relative thereto, on behalf of Urquhart, is to the effect that Paschke fails to disclose two of its essential features. It is urged that the count requires the creation of suction, by the flowing of a stream of liquid, under pressure, through an ejector, such suction to be sufficient of itself to draw enough of different powders into the stream at substantially the same locus, to form, when combined with the fluid, a stable foam, and it is insisted that Paschke does not disclose either (a) the feature of creating suction by the flowing liquid, or (b) the drawing of different powders, separately, into the stream at substantially the same locus.

Urquhart, in his drawings and specification, discloses a hopper provided with a partition which forms separate receptacles for the different powders. The hopper converges at its lower end to a funnel-shaped section which is screwed into the ejector member through which the fluid runs under pressure. A hose attached to one end of the ejector member, said hose being connected to a water main or the like, serves as a supply means for the entrance of the fluid, and a hose at the other end serves as a discharge means. As

the water passes through the so described assembly, the suction created by its flowing, under pressure, is alleged to draw the powders downwardly from the receptacles in the hopper, the powders entering the stream at substantially the same point. The chemical properties of the powders are such as that, when they enter the flowing stream and combine with the fluid, the foam is formed.

The drawings of Paschke bear practically no resemblance to the drawings of Urquhart. Paschke discloses three different forms of his invention by three different figures. Figures 1 and 2 show an arrangement wherein there are separate receptacles for the different chemical elements, while figure 3 shows an arrangement whereby they may be stored together in a common receptacle.

For the purposes of this controversy the form disclosed by figure 1, and the description of same in the Paschke specification may be taken for comparison, since that form approaches, as nearly as does any, the Urquhart device.

This form discloses two vessels for receiving the required chemicals separately. Between these two vessels is "a receptacle or bottle for a gaseous pressure medium, such as carbon dioxide gas." Pipes with the necessary control devices, such as cocks and valves, run from the top of the bottle into the respective chemical-holding vessels extending to near the bottom of each of the latter. Through these pipes the gaseous pressure is applied to the chemicals in the vessels and by this pressure the chemicals are forced upwardly through pipes running from the tops of the vessels and thence into another pipe or ejector, which being connected with a water main, receives the stream of fluid into which the chemicals pass, and in which the foam is formed.

The specification of Paschke nowhere refers to any purpose on Paschke's part to utilize suction in any manner. In each of his forms the chemicals are forced into the stream by pressure of the gaseous element, and not drawn into it by suction of the water flowing under pressure through the ejector. Without the gaseous element, or some similar element, to force the chemicals Paschke's device would apparently be utterly useless for the purposes intended to be served by it.

It is to be borne in mind that Paschke must rely upon the disclosures of his German application. A copy of this is contained in the record, and it is stated therein:

"* * * * The invention resides essentially in the fact that the chemicals serving to generate foam are fed individually or together to the place of utilization by means of a suitable gaseous pressure means and are introduced into a stream of water."

It may be stated that while the language of Paschke's United States application differs in some respects from that of his German application, the meaning of both is the same. In his United States application it is said:

"According to my invention the chemicals serving for the generation of the foam are conveyed individually or together to the place of application by a suitable gaseous pressure medium and there introduced into a stream of water."

In view of the foregoing facts, we feel constrained to disagree with the tribunals of the patent office as to Paschke's right to make the count in issue. This question received practically no discussion by the Examiner of Interferences or the Board of Appeals. We find it discussed elaborately only in the opinion of the Law Examiner in his decision upon the motion to dissolve.

Urquhart's motion to dissolve was based upon two grounds, the first being the alleged inoperativeness of Paschke's device and the second upon the latter's alleged lack of disclosure. The matter of inoperativeness has apparently been abandoned by Urquhart, and only the latter question is before us.

The discussion of the suction feature by the Law Examiner seems to be related solely to the question of inoperativeness and not to it as a feature per se, and he discusses, as an independent feature, only the matter of "substantially the same locus" for the entrance of the powders into the stream. Upon this latter phase we find no reason for disagreement with the Law Examiner, but considering the suction element, as a feature within itself, we think it must be held that Paschke failed to disclose it.

It is argued, to be sure, that a certain amount of suction is inherent in Paschke's device by operation of the laws of nature. It is also argued that a part of Urquhart's powders are introduced into the stream by the force of gravity. Granting both these contentions to be true, the fact still remains that Urquhart's device—which we must accept as being operative—does respond to the requirements of the count relating to suction and its utilization, while Paschke teaches nothing in this regard.

Under the views here expressed, upon this phase of appeal No. 3217, it is unnecessary to consider the other reasons of appeal.

The decision of the Board of Appeals as to the count in interference No. 54,287 is reversed and priority upon that count awarded to appellant.

Appeal No. 3218, Interference No. 55,734:

The count here involved reads:

"The method of extinguishing fire which consists in feeding separately a plurality of dry powdered substances of different chemical content from external sources and separately inert into a flowing solvent therefor at substantially the same locus, said substances being maintained inert until contact is had with said solvent and forming when combined therewith a stable foam, and blanketing a fire with the foam."

In this case also there was a motion by Urquhart to dissolve upon the ground that Burmeister is not entitled to make the count because of (a) estoppel and (b) lack of disclosure to support the count, it being alleged that same would be unpatentable if not interpreted to exclude Burmeister's disclosure.

The motion to dissolve was overruled by the Law Examiner. Thereupon the Examiner of Interferences, considering the case upon the merits, after the taking of testimony, awarded priority to Burmeister.

In this case, as in interference No. 54,287, supra, Urquhart relied upon certain work done by him in the fall of 1924 for reduction to practice, as well as for conception. The Examiner of Interferences held that he had not reduced to practice at said time because the proofs as to what was then done (while sufficient in the Examiner's opinion to constitute reduction to practice in the Paschke case) did not establish any act of "blanketing a fire with the foam."

In other words, as we understand it, there was no proof sufficient to convince the Examiner of Interferences that Urquhart had actually blanketed a fire at the stated time, or that he showed proper diligence in performing this act within the required time.

Burmeister's application, as has been said, was filed in the United States Patent Office April 26, 1926, but he, like Paschke in appeal No. 3217, claimed the benefit of an application filed in Germany. This German application was filed May 28, 1925.

Upon appeal the Board of Appeals af-firmed the decision of the Examiner of Interferences, but not solely upon the basis adopted by the latter. The board went further and virtually reiterated the views expressed in interference No. 54,287, supra, to the effect that Urquhart's work in the fall of 1924 "was not a success but was merely an abandoned experiment."

Both the Examiner of Interferences and the Board of Appeals expressly approved the decision of the Law Examiner denying Urquhart's motion to dissolve.

Urquhart's reasons for appeal here are substantially the same, in their general aspects, as those in interference No. 54,287, supra, but there is no assignment of error covering the question of estoppel presented before the Law Examiner, and that element need receive no further consideration. The other element involved in this phase of the controversy is that of disclosure. Urquhart argues that Burmeister fails to disclose an arrangement for segregating the powders and feeding them separately into a flowing solvent at substantially the same locus, as the count requires, but that he "inevitably mixes the powders on their downward course and diverges the mixed powders into a shower of scattered particles which are washed together by the converging wash-water to form foam in the mixing chamber which is then drawn, as a foam mixture, into the flowing solvent in the conduit g."

Urquhart's device has been sufficiently described in our discussion respecting interference No. 54,287, supra.

Burmeister discloses an arrangement having a cylindrical container divided into two compartments, one above the other. The upper compartment serves for the reception and storage of pulverized or liquid chemicals and the lower compartment as a mixing chamber wherein the chemicals "are dissolved in water or added to it."

The Board of Appeals expressly approved the finding of the Law Examiner to the effect that Burmeister's drawings disclose a division of the upper compartment into two sections, in which chemicals may be separately stored and from which they may drop simultaneously "into the mixing chamber to be flushed away by a flowing stream of water." It is also pointed out that the drawings disclose, and the specification refers, to another chamber adjacent the upper compartment which extra chamber may be utilized to hold a "foam stabilizer" in liquid form.

From our study of the specification, and particularly the drawings, of Burmeister, we are convinced that his disclosure is sufficient to meet the requirements of the count under the usual rule of broad interpretation. There is no limitation in this count respecting suction such as was present in the count of interference No. 54,287, supra.

We, therefore, turn to the questions of Urquhart's reduction to practice and diligence.

It is to be remembered that while the Examiner of Interferences and the Board of Appeals reached the same general conclusion, the grounds upon which their respective decisions were based, may be said to be somewhat different, or, more accurately, the board's decision rested upon broader ground than did the decision of the Examiner of Interferences.

The Examiner of Interferences who passed upon this case was the same person who passed upon interference No. 54,287, supra, and it seems perfectly evident that, had he found an actual blanketing of a fire with foam by Urquhart, he would have held Urquhart entitled to priority, as was held by him in the other case, whereas the board would not have so held, but would have rested its decision upon its conclusion that what Urquhart did in the fall of 1924 was nothing more than an abandoned experiment and that he was lacking in diligence during the period when diligence was required.

In a statement made during the oral argument before us, which was subsequently elaborated and reiterated in a written communication formally filed, counsel for Burmeister has, by concession, eliminated the necessity of our considering the effect of Urquhart's alleged failure to prove that he actually extinguished a fire. The pertinent paragraph of the written statement reads:

"Appellee concedes that, if Urquhart had in all other respects reduced to practice the process of the count in interference No. 55,734 before Burmeister (May 8th, 1925), that count should not be awarded to Burmeister on the mere technical ground that Urquhart did not "blanket a fire" since there is no separate invention in extinguishing a fire with a process intended and known to be practical for the purpose. See Underwood v. Gerber, 149 U. S. 224, 13 S. Ct. 854, 37 L. Ed. 710."

Counsel for Burmeister maintains, however, that the Board of Appeals is correct in its finding of a failure in other respects, on the part of Urquhart to reduce to practice, and argues that his failure to make an actual fire test is "very strong evidence that Urquhart's experiment did not 'produce something of practical use' for extinguishing a fire 'coupled with the knowledge that the thing will work practically for the intended purpose' and, therefore, was not a reduction to practice," the case of Sherwood v. Drewson, 29 App. D. C. 161, 1907 C. D. 642 being cited.

The record in the consolidated cases is quite voluminous. Urquhart alone took testimony and this testimony requires nearly 800 pages for its printing. It presents a quite comprehensive résumé of his activities in respect to, and interest in, the art of generating foam for the purpose of extinguishing fires. He seems to have become interested in the subject as early as 1922, and to have procured from his attorney a number of prior patents for examination and study. In 1923 he became sales manager of the foam stabilizer department of the American Dyewood Company, receiving as compensation both a fixed salary and commissions on sales.

The feature of commissions furnished an incentive for his interest in there being development in this field, and it is in evidence that he made studies of different plans and methods for producing foam. Among other devices that came to his attention was one using what is designated as a "cement gun" for injecting chemicals into water, and he seems to have taken some interest in the matter of a patent being secured upon an application filed April 15, 1925, by one Palmer, another employee of the American Dyewood Company, to whom the application was assigned.

It is unnecessary to recite his many activities in detail, inasmuch as the case, in our view, must turn upon the construction which is to be given by what was done by himself and a brother, G. Gordon Urquhart, at Cynwyd, Pa., in the fall of 1924. It is conceded that he may rely upon that time for conception.

Much of his testimony as to what was there done is quoted verbatim in both the opinion of the Examiner of Interferences and that of the Board of Appeals, and it is not deemed necessary to here repeat it as fully as there set forth.

The purport of the testimony of both the Urquharts is that in September, 1924, by the use of an apparatus which apparently responds to the counts of both this interference and interference No. 54,287, supra, there was produced a foam, the experiment taking place

on the lawn of G. G. Urquhart's home in Cynwyd.

The testimony of appellant himself is:

"* * * The device discharged a foam blanket onto the ground which continued to expand. The quality of the foam was good, in fact it was quite similar to the foam which I had produced in the wash basin at the office. My brother asked me what I thought of the proposition. I informed him that I should like to work and study over the facts before rendering an opinion as to what I would consider a device which could be operated by the layman. He seemed rather impatient but I did not feel that any means of controlling the chemical feed should rely entirely upon the flow or suction of chemicals into a chamber which would probably be used over a period of years with chemicals of possibly varying physical characteristics. I had perfected a rather delicate mechanism for the introduction of fluids and I saw no reason why I should not proceed to further develop a device which while obviously operable might be improved, at least study would give information of value."

At another place in the record, R. M. Urquhart, referring to operations carried out by use of the device says: "The machine produced foam." "Foam was produced," and that foam was made from the device "on several occasions on this Sunday"—evidently the Sunday of the first operation in September, 1924.

G. Gordon Urquhart testifies that by use of the device in 1929, "Foam was produced on the floor of what I would term good consistency and tenacity."

A witness, Schoeni, testified that in the fall of 1924 he made a "funnel" for Urquhart, having a partition therein. Other testimony, we think, sufficiently established that this funnel was the instrument used for holding the powders upon the occasion of the experiment carried out on G. G. Urquhart's lawn.

There is also testimony by one R. Horace Grigg, a neighbor of G. G. Urquhart, to the effect that he saw the latter, upon several occasions, produce foam and extinguish fires therewith, using a device which the witness said resembled Urquhart's Exhibit L, which exhibit, we think, is established as being the device used in the experiment.

The witness Grigg is not definite as to the time or times when he saw Urquhart do this, nor is he positive as to the identity of the device, but we regard parts of his testimony as being corroborative of the fact that Urquhart did at some time develop a foam producing method which from Griggs' description was substantially the method of the count, and we are strongly of the opinion that his testimony indicates the successful use of this method in 1924. We would not be understood as holding that the testimony of Griggs is of itself sufficiently definite in regard to the date to be decisive, but we find nothing in the record to justify any suspicion of the testimony of the Urquharts themselves upon this point.

The Board of Appeals seems to attribute some weight to the fact that Urquhart made no protest against the filing of the application for patent by Palmer, which has been alluded to above, and it also comments upon Urquhart's continued interest in the "cement gun."

These matters, when considered in the light of the entire record and in connection with Urquhart's relations to, and with, his employer, do not, it seems to us, seriously militate against his contentions as to an actual and successful reduction to practice at the time claimed by him.

We, therefore, feel constrained to disagree with the board's finding. In our opinion, Urquhart is entitled to a date as of the fall of 1924 for both conception and reduction to practice, and the question of diligence is not, therefore, involved.

In consequence, the decision of the Board of Appeals as to the count in interference No. 55,734 is also reversed and priority is awarded to R. M. Urquhart.

Reversed.